**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| INEZ LEWIS,<br>Individually and on Behalf of<br>DESMOND LEWIS, Deceased | CIVIL ACTION NO. 22-0195 |
| VERSUS | JUDGE ALEXANDER C. VAN HOOK |
| DEYONTA HORTON,<br>CITY OF SHREVEPORT, ET AL. | MAGISTRATE JUDGE McCLUSKY |

## <u>MEMORANDUM RULING</u>

Pending before the Court is a Motion for Summary Judgment ("Motion") filed by Defendants Deyonta Horton, City of Shreveport, and American Alternative Insurance Corporation (collectively "Defendants"). (Record Document 58). Plaintiff Inez Lewis, individually and on behalf of Desmond Lewis, deceased ("Plaintiff")[1] filed a Memorandum in Opposition (Record Document 76 and hereinafter "Opposition"), Defendants filed a Reply (Record Document 83 and hereinafter "Reply"). Defendants filed a corrected exhibit and a supplemental exhibit to their Motion (Record Document 87 and hereinafter "Supplement to Motion"), Plaintiff filed a Supplemental Response in Opposition (Record Document 91 and hereinafter "Supplemental Response") and Defendants filed a Supplemental Reply (Record Document 92). For the reasons assigned herein, Defendants' Motion is **GRANTED**.[2]

---

[1] This action was originally filed by Ingrid Lewis, the mother of Desmond Lewis; however, following her death Inez Lewis, the grandmother of Desmond Lewis, took over as plaintiff.

[2] Also, before the Court are two *Daubert* motions, one by each party objecting to the other's expert. Record Documents 64, 68 and related briefing. For the reasons stated herein, which do not rely on either expert's opinion, both motions are denied as moot.

## FACTUAL BACKGROUND

This lawsuit arises from the events of September 11, 2021, when what started out as a simple loitering and trespassing call resulted in the tragic death of Desmond Lewis ("Lewis") after a brief struggle with Deyonta Horton ("Officer Horton"). From the time of the original 911 call at 7:34 p.m. to the moment the fatal shots were fired at 7:40 p.m., fewer than seven minutes elapsed, and fewer than three minutes passed from when the officer first arrived on scene to investigate. The incident went from benign to deadly in a very short period of time.

The evidence in the record of this case is derived from several different sources, none of which tells a complete story, but which taken together create a detailed account of what happened that evening. The record includes witness testimony in the form of written and video depositions; video evidence from police dash-cam units and surveillance cameras located at the Circle K convenience store, Linwood Public Charter School, and a used car lot; the autopsy report; an audio recording of the original 911 call; screen shots of the police event chronology; and the audio recording of the entire event from start to finish recorded by Officer Horton's body microphone. Taken together, these sources tell the tale. After carefully examining each piece of evidence in the record, it is beyond peradventure that summary judgment is proper.

At 7:34 p.m. on September 11, 2021, an employee of a Circle K gas station and convenience store located 339 West 70th Street in Shreveport called 911 to report a man loitering in front of the store asking customers for money, and that she had asked him to leave but he returned and continued to bother customers. (Record

2

Document 58-3 Exhibit A-5 at 0:10-20).  She described him as a black man wearing blue jeans and a white shirt. (Record Document 58-3 Exhibit A-5 at 0:53-58).  Officer Horton was dispatched to the Circle K location and given a description of the man and the events leading to the 911 call. (Record Document 58-8 Exhibit C-1 at 1 and C-2 at 1; Record Document 58-13 at p.2 ¶3).

Upon arrival, Officer Horton saw a black man, wearing blue jeans and holding a white shirt, a plastic bag and other items in his hands, standing in front of the Circle K and otherwise matching the description given to him in the dispatch call. (Record Document 58-3 Exhibit A-4 at 19:37:43-48; Record Document 58-12 at p.2 ¶3).[3]  A female Circle K employee pointed to the man through the store window. (Record Document 58-3 Exhibit A-4 at 7:37:50; Record Document 58-12 at p.3 ¶5). There were no other persons standing in front of the store or at the gas pumps, only people sitting in vehicles. (Record Document 58-3 Exhibit A-2 at 0:7:37:46-50 and Exhibit A-4 at 19:37:43-48; Record Document 58-12 at p.3 ¶5). Officer Horton, wearing a Shreveport Police Department uniform and driving a marked police cruiser, pulled up near the man, later identified as Lewis, and said "Ah, come here," then "Right here," then "Come here, bro," motioning for Lewis to step over to his patrol car. (Record Document 58-3 Exhibit A-2 at 0:7:37:50-54 and Exhibit A-4 at 19:37:48-54; Record Document 58-12 at p.3 ¶¶6-7). Instead, Lewis started walking away from the store and, as Officer Horton opened his vehicle door, began running

---

[3] Record Document 58-3 Exhibit A-4 contains four separate dash-cam recordings, each taken from different police vehicles.  All references to Exhibit A-4 contained herein are only to Officer Horton's dash-cam video and audio recording; the other three dash-cam recordings are not relevant.

away. (Record Document 58-3 Exhibit A-2 at 0:7:37:54-55 and Exhibit A-4 at 19:37:53-55; Record Document 58-12 at p.3 ¶¶6-7). Officer Horton immediately jumped out of his vehicle and pursued Lewis. (Record Document 58-3 Exhibit A-2 at 0:7:37:56 and Exhibit A-4 at 19:37:55-59; Record Document 58-12 at p.3 ¶8).[4]

Running west along West 70th Street, Lewis crossed Linwood Avenue and continued in front of the Linwood Public Charter School, with Officer Horton chasing him. (Record Document 58-3 Exhibit A-1 at 19:38:14-18; Exhibit A-3 at 03:02-09, and Exhibit A-4 at 19:37:55-59; Record Document 58-12 at p.4 ¶9). In front of the Linwood Public Charter School, Lewis stopped and turned around to face Officer Horton, at which point Officer Horton grabbed Lewis, threw him face down to the ground, and jumped on his back, pinning Lewis down. (Record Document 58-3 Exhibit A-1 at 19:38:19-21; Exhibit A-3 at 03:10-12, and Exhibit A-4 at 19:37:55-59; Record Documents 58-12 at p.4 ¶9; 58-13 at p. 94; 76-3 at p.17; and 76-4 at p.15).

Lewis and Officer Horton struggled for approximately two minutes, Lewis trying to raise up and throw Officer Horton off his back, and Officer Horton trying to control Lewis and get his arms behind his back to handcuff Lewis and effect an arrest. (Record Document 58-3 Exhibit A-1 at 19:38:22-19:40:16; Exhibit A-3 at 03:13-05:04, and Exhibit A-4 at 19:38:21-19:40:16; Record Document 58-12 at p.4 ¶9). During this struggle Lewis repeatedly yells for Officer Horton to "move" while Officer Horton threatens to tase Lewis if he doesn't stop resisting. (Record Document 58-3 Exhibit

---

[4] Exhibit A-4 contains both video and audio recordings from Officer Horton's dash-cam unit. At the point where Lewis starts running and Officer Horton exits his vehicle in pursuit, the parties move out of camera view. Thereafter, all citations to Exhibit A-4 are to the audio from Officer Horton's body microphone recorded on his vehicle's dash-cam unit.

A-4 at 19:38:25-19:39:09). Officer Horton then radios to his dispatch that he is on the ground outside of the Linwood Charter School. (Record Document 58-3 Exhibit A-4 at 19:39:13-30; Record Document 58-12 at p.4 ¶10).

Across West 70th Street, Dwight Hudson ("Hudson"), Ivory Williams ("Williams"), and Hudson's younger brother Darien were in the office of Hudson's used car lot, when Hudson noticed on his security camera two men running down the street. (Record Documents 76-3 at pp.14-15; and 76-4 at pp.12, 17). Hudson went outside to investigate and saw Officer Horton tackle Lewis, then lay on Lewis's back, pinning him to the ground. (Record Document 58-3 Exhibit A-3 at 03:15-28; Record Documents 76-3 at pp.15-26, and 76-4 at pp.17-18). Hudson then returned to the office to urge Williams and his brother to come outside to see for themselves. (Record Document 58-3 Exhibit A-3 at 03:28-37; Record Documents 76-3 at p.15; and 76-4 at p.17). All three men then went outside and stood near the sidewalk watching the events from across West 70th Street. (Record Document 58-3 Exhibit A-3 at 03:45; Record Documents 76-3 at pp.15-17; and 76-4 at p.18). Hudson initially thought they were just two guys fighting, but Officer Horton turned in a manner so that Hudson could see "POLICE" on the back of his shirt and realized it as an attempted arrest. (Record Document 76-4 at p.18). Video surveillance from the car lot and charter school cameras show that cars occasionally passed by on West 70th Street between Hudson and Williams on one side and Officer Horton and Lewis on the other. Some cars stopped directly in front of Officer Horton and Lewis, and each man can be seen turning briefly to talk to each other or watch other events to include watching an

individual, later identified as Jonathan Apperley ("Apperley"), approaching and then running away from Officer Horton and Lewis. (Record Document 58-3 Exhibit A-3 at 03:45-06:05; Record Document 76-4 at pp.18-19). For the most part the video shows the three men watching Officer Horton and Lewis.

During this time, Apperley and his mother were driving east on West 70th Street, and as they approached Linwood Avenue, they saw two men wrestling on the ground in front of the Linwood Charter School. (Record Documents 58-11 at p.1 ¶1; and 87-1 at 4:28-5:15).[5] Apperley initially thought they were just two guys fighting, but as they passed by Officer Horton, he determined that one of the men was a police officer. (Record Documents 58-11 at p.1 ¶2; and 87-1 at 04:40-42). Realizing an officer was struggling with a man, he stopped his car just past Lewis and Officer Horton, got out of his car and ran back, bending over Officer Horton to see if he could offer help. (Record Document 58-3 Exhibits A-1 at 19:39:10-43, A-3 at 04:00-33 and A-4 at 19:39:41-44; Record Documents 58-11 at p.2 ¶5; and 87-1 at 5:15-20). Officer Horton declined the offer, as he didn't want a citizen involved in a police arrest. (Record Documents 58-12 at p.4 ¶12; 58-11 at p.2 ¶5). Apperley then stood up and took a step back but remained close to Lewis and Officer Horton. (Record Document 58-3 Exhibit A-1 at 19:44-49, and Exhibit A-3 at 04:35-40; Record Document 76-4 at pp.18-19, 27, 34, 53).

---

[5] In their Motion, Defendants proffered as supporting evidence the Declaration of Jonathan Apperley. During Apperley's subsequent deposition several minor errors were discovered in the declaration. Defendants subsequently proffered a revised declaration and a supplemental exhibit with Apperley's video deposition in their Supplement to Motion, to which Plaintiff objected in her Supplemental Response. Because the errors in and changes to the original declaration were immaterial and do not affect this ruling on the Motion, the Court cites to the original declaration.

Approximately eight seconds after Apperley stood up and stepped back, Officer Horton and Apperley both state that they saw Lewis pull a gun from around his waistband. (Record Documents 58-1 at p.4 ¶13; 58-11 at p.2 ¶8; and 87-1 at 06:20-25). Hudson and Williams, watching from across the street, state that they did not see any gun (Record Documents 76-3 at pp.27, 30; and 76-4 at pp.34-35, 51-53), and the videos are not clear enough to show a gun. (*See* generally Record Document 58-3 Exhibit A-1 at 19:39:45-40:20, and Exhibit A-3 at 04:35-05:10). However, Lewis then tells Officer Horton, "You better fucking shoot me or we'll shoot each other." (Record Document 58-3 Exhibit A-4 at 19:40:06-08; Record Document 58-12 p.5 ¶15).

Upon believing that he saw a gun, Apperley immediately ran across two lanes of traffic to the center median (Record Document 58-3 Exhibit A-1 at 19:38:51-54, and Exhibit A-3 at 04:43-50; Record Documents 76-3 at pp.35-36; and 76-4 at pp.18-19, 27), while Officer Horton leaned back down on Lewis, putting his hands over Lewis's hand to try and prevent Lewis from manipulating or aiming the gun. (Record Document 58-3 Exhibits A-1 at 19:39:51-40:15, and A-3 at 04:42-05:03; Record Document 58-12 at pp.4-5 ¶14). Officer Horton yells, "Drop the gun." (Record Document 58-3 Exhibit A-4 at 19:40:10-11; Record Document 58-12 at p.5 ¶16).

Unable to wrest the gun away from Lewis, Officer Horton unholstered his own weapon and attempted to shoot Lewis; however, the gun did not fire. (Record Documents 58-12 at p.5 ¶19; and 76-4 at pp.19, 29, 32). He then checked the security of the clip, re-racked the gun and, six seconds after yelling "Drop the gun", fired two shots, striking Lewis in the back of the head and killing him. (Record Document 58-

7

3 Exhibit A-1 at 19:40:14-17, Exhibit A-3 at 05:02-05, and Exhibit A-4 at 19:40:14-17; Record Documents 58-12 at p.5 ¶19; 76-3 at pp.16, 24; and 76-4 at pp.19, 29, 32). Apperley, Hudson and Williams all visibly reacted to the shots. (Record Document Exhibit A-3 at 05:06-08). Breathing heavily, Officer Horton sat back for a few seconds, then called "shots fired" over his radio to his dispatch and called for the fire department to respond. (Record Document 58-3 Exhibit A-1 at 19:40:18-41:26, Exhibit A-3 at 05:06-06:14, Exhibit A-4 at 19:40:18-41:30). Officer Horton then steps away from Lewis and stands apart, saying nothing and apparently waiting for assistance. (Record Document 58-3 Exhibit A-1 at 19:41:27-40, Exhibit A-3 at 06:15-28, and Exhibit A-4 at 19:41:31-40; Record Document 76-4 at pp.34, 36, 47).

Approximately 80 seconds after Lewis was shot, Officers Jamie Bryant ("Bryant") and Chandler Cisco ("Cisco") arrived at the scene, parked in the street and jumped out of their vehicle to assist. (Record Document 58-3 Exhibit A-1 at 19:41:41, Exhibit A-3 at 06:25, and Exhibit A-4 at 19:41:41; Record Documents 58-9 at p.2 ¶¶3-4; 58-10 at p.2 ¶4). Both said that they saw Lewis face down with the gun still under his hand, though they differ slightly on where the gun was, Bryant saying it was in Lewis's right hand with his left hand underneath, and Cisco not identifying which hand but saying it was above his shoulder with his palm on the handle. (Record Documents 58-9 at p.2 ¶4; and 58-10 at p.2 ¶5). Bryant and Cisco each state that Bryant grabbed the gun and threw it a few feet away to his left. (Record Documents 58-9 at p.2 ¶5; 58-10 at p.2 ¶6). Bryant and Cisco then handcuffed Lewis as other officers began arriving, one starting CPR on Lewis, with Bryant then taking over

performing CPR until paramedics arrived. (Record Document 58-3 Exhibit A-1 at 19:41:42-42:30, and Exhibit A-3 at 06:42-07:30; Record Documents 58-9 at p.2 ¶5; 58-10 at p.2 ¶6). During this time numerous officers and other first responders arrived on the scene, parking their vehicles in the street, with other citizen vehicles driving by, some stopping to observe, until the police officers finally blocked off West 70th Street. (Record Document 58-3 Exhibit A-1 at 19:41:05-42:35, and Exhibit A-3 at 06:05-07:35; Record Document 58-8 at pp.4, 8). Williams, Hudson and his brother can be seen watching all of this from across the street, until eventually they walk back inside the shop. (Record Document 58-3 Exhibit A-3 at 09:45).

After Lewis was shot, the Louisiana State Police arrived to conduct an investigation and take photos of the area. (Record Documents 58-4; 58-5; 58-8; and 58-16). In those photos, a brown and black gun, gray plastic bag, and other personal items can be seen on the ground near Lewis's body. (Record Documents 58-4; and 58-5). Lewis's body was eventually taken to the coroner's office for examination and autopsy. (Record Document 58-16). The coroner's report states that, in addition to Lewis's clothing and jewelry, an empty black holster was found on his body. (Record Documents 58-4; 58-7; and 58-16).

As a result of these events and the death of Lewis, his mother brought this action on his behalf charging Officer Horton under 42 U.S.C. § 1983 and Louisiana state law with violating Lewis's constitutional rights by using excessive force and with wrongful death in his attempted arrest and then killing of Lewis. The City of Shreveport was also included in this action with federal and state law claims alleging

9

that it maintained a facially unconstitutional use of force policy, and it was negligent for failing to train, supervise and/or discipline its police officers (the "*Monell* claims"); and American Alternative Insurance Corporation with state law claims, seeking to recover any and all sums it is obligated to pay Plaintiff on behalf of its insureds or to indemnify its insureds.

## PROCEDURAL BACKGROUND

Defendants have previously filed a Motion to Dismiss for Failure to State a Claim, which was fully briefed by the parties. *See* Record Document 14 (Motion), 16 (Response) and 21 (Reply).  In a Memorandum Ruling, Judge S. Maurice Hicks, Jr. granted Defendants' Motion in part, leaving only the federal and state law claims of excessive force against Officer Horton, the *Monell* claims against the City of Shreveport, and the state law claims against the insurance company. *See* Record Documents 22 and 23 (Memorandum Ruling and Order).

## LAW AND ANALYSIS

### A. Summary Judgment Standard.

The law pertaining to summary judgment is well settled.  Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if

10

the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.* "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)).  The moving party need not support its motion with affidavits or other evidence, but to defeat a motion for summary judgment the non-movant must present evidence sufficient to establish the existence of each element of its claim as to which it will have the burden of proof at trial. *Id.* at 322.

**B. Analysis.**

**1. Qualified Immunity.**

Officer Horton asserts qualified immunity as a threshold affirmative defense to Plaintiffs' Section 1983 claims. (Motion at 6-9). Section 1983 provides a federal cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" against any person acting under color of state law. *See* 42 U.S.C. § 1983. Section 1983 does not itself create substantive rights; rather, it merely provides remedies for the violation of rights guaranteed to citizens by the United States Constitution or other federal laws. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985).  The

11

doctrine of qualified immunity shields government officials from liability for claims against them in their individual capacity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   Qualified immunity serves to shield government officials from harassment, distraction, and liability when they perform their duties reasonably, and it applies regardless of whether the official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). A Section 1983 complaint must allege that the constitutional or statutory deprivation was intentional or due to deliberate indifference and not the result of mere negligence. *Farmer v. Brennan*, 511 U.S. 825 (1994); *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability, ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Consequently, qualified immunity questions should be resolved at the earliest possible stage in litigation. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). While qualified immunity is technically an affirmative defense, once it has been raised, it is the plaintiff's burden to negate the defense. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court held that a court ruling upon the issue of qualified immunity must apply a two-step analysis.

12

First, the court must determine whether the facts alleged show the officer's conduct violated a constitutional right.  Second, if a violation has been established, the court must determine whether the officer's actions were objectively reasonable in light of clearly established law at the time of the conduct in question. *Id*. *See also Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007) (same). In *Pearson* the Supreme Court held that while the sequence set forth in *Saucier* is often appropriate, it is no longer mandatory. *Pearson*, 555 U.S. at 236. Instead, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*.  "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact. *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (citing *Malley v. Briggs*, 475 U.S. 335, 343 (1986) (holding the qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law.") The question of whether an official's conduct was objectively reasonable is a question of law to be decided by the court. *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003).

To be clearly established, a legal principle must be found in the holdings of either "controlling authority" or a "consensus of cases of persuasive authority,"

13

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 6g17 (1999)), and defined with a "high 'degree of specificity,'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)). It is not that a case must be directly on point, but rather existing precedent must have provided sufficient notice that the acts violate the Constitution. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). The clearly established test ensures that officials have fair warning that particular conduct violates the Constitution. *Anderson v. Valdez*, 845 F.3d 580, 600 (5th Cir. 2016).

Under either of the two prongs, the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 473–74 (5th Cir. 2019) (quoting *Tolan v. Cotton*, 572 U.S. 650 (2014)). Instead, with a notable exception, the Court must view the evidence in the light most favorable to the opposing party, here Plaintiff. *Id.*

The exception is when the facts favoring the opposing party are blatantly contradicted by the record evidence. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (finding that the officer's dash-cam video recording so blatantly contradicted the plaintiff's version of events that no reasonable jury could believe plaintiff's claims). In such event, the court should view the evidence in the light reflected by the record evidence. *Id.* This exception is well established in this circuit. *See, e.g., Carnaby v. City of Houston*, 636

14

F.3d 183, 187 (5th Cir. 2011) (citing *Scott*); *Tucker v. City of Shreveport*, 998 F.3d 165, 170 (5th Cir. 2021) (same); *Poole*, 79 F.4th at 424-25 (same); *Benavides v. Nunez*, 144 F.4th 751, 755 (5th Cir. 2025) (same).

While *Scott* pertained to video recordings, the Supreme Court did not limit its findings to videos, citing "record" evidence as the basis for its ruling. *Scott*, 550 U.S. at 380. Indeed, other courts have found that affirmative statements captured on audio recordings in the record that clearly contradict a party's claims may also preclude viewing the facts in such party's favor. *See, e.g., Coble v. City of Whitehouse, Tennessee*, 634 F.3d 865, 868 (6th Cir. 2011) (adopting *Scott* to audio recordings, using the body microphone recording after the parties moved out of view of the dash-cam camera); *Toner v. Village of Elkton*, 547 Fed. Appx. 720, 722 (6th Cir. 2013) (same); *Marksmeier v. Davie*, 622 F.3d 896, 900 (8th Cir. 2010) (audio recording alone sufficient to contradict plaintiff's version of events at the summary judgment stage).

### 2. Discussion.

So, now to apply all of that guidance to the facts of this case. To defeat Defendants' Motion as to qualified immunity, Plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (internal citations omitted). In this case, Plaintiff alleges that Officer Horton violated her son's Fourth Amendment rights to be free from unreasonable search and seizure by (1) chasing him from the Circle K parking lot without reasonable suspicion that Lewis (a) was the subject of the 911 call, or (b) had

committed any crime, and (2) shooting Lewis dead, alleging that Lewis was unarmed and not a lethal threat to Officer Horton or anyone else.  We examine each claim in turn.

### (a)  Reasonable Suspicion.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons ... that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)), *overruled in part on other grounds by Davis v. Washington*, 547 U.S. 813 (2006).  "[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot'." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30).  The question then becomes: did Officer Horton have reasonable suspicion to initiate an investigatory stop of Lewis?

As noted above, the record shows that Officer Horton was dispatched to the Circle K to respond to a 911 call about a black male, wearing blue jeans and a t-shirt, who was panhandling, loitering and, after being asked to leave the property several times, was also trespassing. Upon pulling into the Circle K parking lot, the video record shows that Lewis was the only person standing in the area; there was no one at the gas pumps or standing elsewhere in the parking lot or outside the storefront.

16

He was a black male wearing blue jeans but not wearing a white t-shirt, though he was holding one in his hands along with a plastic bag and other items at his waist. While it is possible a second black male who had already departed the scene, or who had gone inside the store, could have been the subject of the 911 call, it was reasonable, given (i) the short time period between the call and Officer Horton's arrival, (ii) no one else was standing in the area, (iii) the similarity of Lewis's appearance and the description of the subject, and (iv) a Circle K employee was pointing through the window at Lewis, for Officer Horton to suspect Lewis as the subject of the trespassing complaint and to initiate an investigatory stop. *See United States v. Alvarez*, 40 F.4th 339, 346 (5th Cir. 2022) ("Relevant facts and considerations may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience."). The recency of the suspected criminal activity also plays a factor in the reasonable suspicion analysis. *Id.* at 347 (where the stop is related to a past and completed criminal activity, reasonable suspicion must satisfy a higher level of specificity than if the officer is responding to a report of ongoing or very recent criminal activity).  Here, Officer Horton was responding to a report of ongoing criminal activity, i.e., trespassing, so the level of specificity to have reasonable suspicion was lower.

Lewis, however, immediately ran from Officer Horton, and a reasonable officer could have taken that action to indicate (a) Lewis was, in fact, the subject of the trespassing complaint, and (b) Lewis was fleeing the area to evade Officer Horton's

17

queries or investigation. *See, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight - wherever it occurs - is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *United States v. Jordan*, 232 F.3d 447, 449 (5th Cir. 2000) (a subject's flight upon seeing the police is a legitimate factor to consider in determining reasonable suspicion of criminal activity); (*United States v. Williams*, 79 Fed. Appx. 677, 680 (5th Cir. 2003) (same).

Officer Horton was dispatched to the Circle K to investigate a black male, whose description closely resembled Lewis, who was panhandling, loitering and trespassing on an ongoing basis.  Officer Horton drove up and identified Lewis as a likely suspect, and when approached, Lewis promptly ran away. A reasonable officer in Officer Horton's position, considering the totality of the circumstances, could have had reasonable suspicion that Lewis was the subject of the trespassing complaint, justifying Officer Horton's attempt at an investigatory stop and foot pursuit of Lewis. Reasonable officers may differ on how to react to the circumstances faced by Officer Horton, and maybe another officer would have simply let him run away.  But, as a matter of law, it was not unreasonable for Officer Horton to pursue Lewis.[6]

---

[6] In her briefing Plaintiff repeatedly points out that, during his deposition, Officer Horton could not define reasonable suspicion. *See, e.g.,* Opposition at p.22.  Officer Horton, however, did not simply drive to the Circle K for another purpose and challenge Lewis on a hunch.  He was dispatched to the Circle K with a fairly detailed description of the trespassing subject, he identified the subject upon arrival both by visual observation and confirmation by the Circle K employee pointing Lewis out, he initiated the investigatory stop with low-key, benign requests, and he had his suspicion elevated when the subject immediately fled. In any analysis, that equals reasonable suspicion. Plaintiff's concern is without merit, and recalls Justice Potter Stewart's famous concurrence in *Jacobellis v. State of Ohio*, where he noted that, while unable to define hard core pornography, he would know it when he saw it. 378 U.S. 184, 197 (1964) (Stevens, J, concurring). Similarly, Officer Horton may not have been able

### (b)    Excessive Force.

Plaintiff further alleges that Officer Horton exercised excessive force in shooting Lewis, claiming that Lewis was actually unarmed and not a threat of using lethal force himself. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.") To prevail on an excessive force claim and thereby establish a constitutional violation, Plaintiff must show "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009). Because reasonableness is the "ultimate touchstone" of the Fourth Amendment, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), excessiveness turns upon whether the degree of force used was reasonable in light of the totality of the circumstances facing the officer. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Barnes v. Felix*, 605 U.S. 73, 80 (2025) ("[T]he Fourth Amendment requires … that a court 'slosh [its] way through' a 'factbound morass'" to determine if an action was reasonable or unreasonable) (quoting *Scott*, 550 U.S. at 383). Relevant factors include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "[O]fficers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (quoting

---

to define reasonable suspicion, but he understood he needed it to effect an investigatory stop and, like Justice Stevens, he knew it when he saw it.

*Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). The reasonableness of the officers' conduct cannot be judged with 20/20 hindsight, but rather must be assessed from the viewpoint of a reasonable officer on the scene at that very moment. *See Graham*, 490 U.S. at 396.  Indeed,

> [n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (citation modified). "Excessive force claims are [thus] necessarily fact-intensive and depend[ ] on the facts and circumstances of each particular case." *Poole*, 691 F.3d at 627–28 (citation modified).  The facts must be judged objectively "without regard to [the officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397. Judging the reasonableness of an officer's actions requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (citing *Garner* 471 U.S. at 8).

Apprehension by the use of deadly force is a seizure, *Garner,* 471 U.S. at 7, and Lewis's death was an injury caused by the deadly force employed, so the only issue is whether the use of that deadly force was reasonable or unreasonable. Here, Plaintiff attempts to defeat Defendant's Motion by asserting that Lewis was unarmed; therefore, Officer Horton's use of deadly force was unnecessary and unreasonable.  As noted above, normally when ruling on a motion for summary judgment, all facts are interpreted in the light most favorable to the opposing party. The exception to that

rule is when the record evidence blatantly contradicts the non-moving party's version of events. Here, reading the facts in either light leads to the same conclusion.

Plaintiff points to the eyewitness accounts of Hudson and Williams to support her contention that Lewis did not have a gun. And any reading of their sworn testimony confirms that both witnesses are adamant and sincere that they did not see a gun in Lewis's hands. For purposes of this ruling, the Court accepts and believes their testimony. What the Court is not willing to do is make the conclusory legal leap that because Hudson and Williams did not see a gun, there must not have been a gun. As noted above in the factual summary, all of the events herein occurred as dusk settled in. No one, including Officer Horton, claims to have seen a gun prior to the last seconds before the shooting occurred – not at the Circle K, not while Officer Horton and Lewis were running, and not during the several minutes they were struggling on the ground.  Apperley did not see a gun when he first approached Officer Horton and Lewis and asked if Officer Horton needed help. During the struggle on the ground, Officer Horton can be heard threatening Lewis several times that if Lewis doesn't stop fighting and put his hands behind his back, Officer Horton will tase Lewis. (Record Document 58-3 A-4-1 at 19:38:37-19:39:09). Officer Horton does not threaten deadly force while he perceives Lewis to be unarmed and not a lethal threat. So it is not surprising that Hudson and Williams did not see a gun up until the last seconds. No one did.[7]

---

[7] In their depositions, both Hudson and Williams acknowledged that they could not see Lewis's hands all of the time.  Record Documents 76-3 at p. 27, and 76-4 at pp. 31-32.  Passing vehicles occasionally blocked their view of Officer Horton and Lewis both before and after the shooting (Record Document 58-3 Exhibit A-3 at 03:45-06:25), and Hudson and Williams occasionally looked away from Officer

Officer Horton and Apperley claim they first saw Lewis pull out a gun approximately 20 seconds before the shooting.  They both state in their sworn testimony that Lewis pulled the gun from underneath him, at which time Apperley ran away and Officer Horton dove on Lewis's hands to prevent him from raising the gun to shoot. And there is sworn testimony from Officer Bryant that when he arrived on the scene, he saw the gun and pulled it away from Lewis, and from Officer Cisco that when he arrived he also saw the gun by Lewis.  All four were close to Lewis when each saw the gun and clearly had a better vantage point than Hudson and Williams.

Beyond the sworn testimony of Hudson and Williams, who were across the street, Plaintiff's only explanation for why a gun was found at the scene was that it could have been placed there after the fact. *See* Record Documents 76-1 at pp.11-12; 76-3 at pp.28-29; and 76-4 at p.37.  That theory ignores that Apperley saw the gun before the shooting, that Bryant threw the gun away from Lewis's body rather than leave (or place) it in his hand, and requires Officer Horton, Bryant or Cisco to have planted the firearm at the scene.  And nowhere does Plaintiff' acknowledge, let alone try to explain, the coroner's report that an empty holster was found on Lewis.  In short, Plaintiff's theory is pure conjecture, which is insufficient to defeat summary judgment. *See, e.g., Ontiveros*, 564 F.3d at 382 ("[T]o negate a defense of qualified

---

Horton and Lewis (*see, e.g.,* Record Document 76-4 at p.19, where Hudson notes that they watched Apperley run away to the median "[a]nd then we looked back at the law…."). Apperley ran away when he and Officer Horton perceived Lewis pulling out a gun, which means Hudson and Willaims were watching Apperley run across the street at exactly the same time Lewis and Officer Horton were struggling over the gun. Further evidence that, while they did not see Lewis with a gun, their observations are not conclusive regarding the presence of a gun.

22

immunity and avoid summary judgment, the plaintiff need not present absolute proof, but must offer more than mere allegations.") (citation modified).

Finally, there is the audio recording from Officer Horton's body microphone, which corroborates the testimony of Officer Horton and Apperely.  On the recording Lewis can clearly be heard to say, just before Officer Horton first draws his weapon and elevates his responsive level of force, "You better fucking shoot me or we'll shoot each other" (Record Document 58-3 Exhibit A-4 at 19:40:06-08), clearly claiming the ability to, in fact, shoot Officer Horton.  Two seconds later Officer Horton yells, "Drop the gun" and the sound of someone racking a weapon can be heard.[8]  (Record Document 58-3 Exhibit A-4 at 19:40:10-14).  Then, and only then, does Officer Horton introduce deadly force, when he perceived being faced with deadly force.  The audio statements and sounds are clear and unequivocal, and to the extent Plaintiff claims otherwise, the audio record blatantly contradicts her version of events.

Taken together, the security camera footage, sworn witness testimony, coroner's report, and audio transcripts, including the audio of Officer Horton's body microphone recorded on his vehicle dash-cam, paint a picture of the tragic events that resolves all genuine issues of material fact.  For those reasons, Officer Horton's actions in using lethal force when, and only when, he perceived he faced lethal force were reasonable as a matter of law. Accordingly, Officer Horton is protected by the doctrine of qualified immunity and Plaintiff's Section 1983 claims are precluded.

---

[8] The sounds heard on the audio recording are consistent with Officer Horton's and other testimony that his service weapon did not initially fire and that he re-racked the gun before shooting Lewis. (Record Documents 58-12 at p.5 ¶19; 76-3 at p.24; and 76-4 at p.19).

### 3. *Monell* Claims.

Finally, we address Plaintiff's remaining *Monell* claims that the City of Shreveport failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of excessive force. Under Section 1983, municipal liability generally requires proof of three elements: (1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights whose moving force is the policy or custom. *See, e.g., Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978); and *Valle v. City of Houston*, 613.F.3d 536, 541-42 (5th Cir. 2020) (same). For the reasons stated above, Plaintiff fails to establish a violation of constitutional rights in this case; accordingly, she cannot prove the requisite third element of her claims, which thus fail as a matter of law.

### 4. State Law Claims.

Plaintiff has alleged violations by the City of Shreveport of Louisiana Civil Code Article 2315, all in relation to the allegations of excessive force. *See* Record Document 1 at ¶¶ 84-91. "Louisiana's excessive force tort mirrors its federal constitutional counterpart." *Deville v. Marcantel*, 567 F.3d 156, 172 (5th Cir. 2009). Because of the Court's holding regarding her federal constitutional claims, Plaintiff's state law excessive force claims also fail as a matter of law.

Plaintiff has further alleged state law claims against Defendant American Alternative Insurance Corporation, pursuant to Louisiana Revised Statute § 1269, to recover any and all sums it is obligated to pay Plaintiff on behalf of its insureds or to

24

indemnify its insureds. *See* Record Document 1 at ¶¶ 79-83. The Court's finding of no liability for Defendants Deyonta Horton and the City of Shreveport render Plaintiff's claims against Defendant American Alternative Insurance Corporation moot.

CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendants' motion for summary judgment (Record Document 58) is **GRANTED**. All Plaintiff's claims filed against Defendants in this matter are **DISMISSED** with prejudice.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 16th day of March, 2026.

**ALEXANDER C. VAN HOOK**
**UNITED STATES DISTRICT JUDGE**